Case No. 25-60576

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

MARK JOHNSON

*Plaintiff - Appellant*

v.

GEORGE MILLER, SR., individual capacity;
DONALD MITCHELL, individual capacity;
CLARKSDALE PUBLIC UTILITIES COMMISSION,

*Defendants - Appellees*

_____

On Appeal from the United States District Court, Northern District of
Mississippi, No. 4:21-cv-120-MPM-DAS, Judge Michael P. Mills, Presiding

_____

## BRIEF FOR APPELLANT

_____

SUBMITTED BY:
Joel F. Dillard
JOEL F. DILLARD, P.A.
775 North Congress Street
Jackson, Mississippi 39202
(601) 509-1372, ext. 2

*Counsel for Mark Johnson*

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record for Appellant Mark Johnson

certifies that the following listed persons and entities as described in the

fourth sentence of Rule 28.2.1 have an interest in the outcome of this case.

These representations are made in order that the judges of this Court may

evaluate possible disqualifications or recusal.

| Appellant | Appellees |
|---|---|
| Mark Johnson | George Miller, Sr. |
| | Donald Mitchell |
| **Counsel for Appellant** | Clarksdale Public Utilities Commission |
| Joel F. Dillard | |
| JOEL F. DILLARD, P.A. | **Counsel for Appellees** |
| 775 North Congress Street | |
| Jackson, Mississippi 39202 | Latoya Merritt |
| (601) 509-1372, ext. 2 | Loden Walker |
| | Phelps Dunbar LLP |
| | 4270 I-55 North |
| | Jackson, MS 39211 |
| | (601) 352-2300 |

*/s/ Joel F. Dillard* .
Counsel of Record for Appellant

i

**STATEMENT REGARDING ORAL ARGUMENT**

Appellant Mark Johnson respectfully requests oral argument. The case involves both complex First Amendment questions and an underdeveloped area of Mississippi law in the Mississippi Whistleblower Protection Act, which warrants focused judicial attention. Oral argument would allow the parties to address the district court's misinterpretation of *Sims*, *Griggs*, *Mt. Healthy*, *Pickering* and other significant precedents, as well as clarify the factual disputes in this thousand-page-plus record that mandate reversal of summary judgment.

# TABLE OF CONTENTS

**CERTIFICATE OF INTERESTED PERSONS**.......................................i

**STATEMENT REGARDING ORAL ARGUMENT**.........................ii

**TABLE OF CONTENTS**.........................................................iii

**TABLE OF AUTHORITIES**.....................................................vi

**JURISDICTIONAL STATEMENT**............................................. 1

**STATEMENT OF THE ISSUES PRESENTED FOR REVIEW**......... 2

**STATEMENT OF THE CASE**.................................................... 3

  1. CPUC considers Johnson "the best" and gives him a raise...................3

  2. Johnson's job is ministerial, and it is not his job to report matters to the City, law enforcement or the press.......................................4

  3. The Commission commits serious abuses...........................................5

    a. City Commissioner Plunk uses his position for financial gain..........5

    b. CPU Commissioner Mitchell engages in sexual harassment............5

    c. CPU Commissioner Miller verbally abuses employees.................... 5

    d. Attorney Hunt bills improperly...................................................... 6

    e. The commissioners refuse to report issues to the State Auditor...... 6

  4. Johnson reports these concerns as a private citizen............................6

  5. Within a day, CPUC suspends Johnson explicitly for whistleblowing.. 7

  6. The City investigates Johnson's allegations. CPUC files a First Amendment retaliation lawsuit against the City. The City drops the investigation to settle the suit....................................................9

  7. By a vote of 3 to 1, CPUC fires Johnson..............................................11

  8. MDES and the Mississippi courts conclude "the evidence does not establish that [Johnson] intentionally circumvented and/or violated policies and procedures."..................................................13

  9. The present lawsuit is filed, improperly dismissed by the district court, then reinstated on appeal.....................................................15

  10. The district court enters summary judgment.....................................16

    a. Mississippi Whistleblower Protection Act: Causation....................16

    b. First Amendment against all Defendants: Causation generally......16

    c. First Amendment causation against CPUC: "majority" animus......17

    d. First Amendment causation against Mitchell & Miller: individual

causation.................................................................................17

e. First Amendment against all Defendants: Pickering......................18

11. Johnson appeals...................................................................18

**SUMMARY OF THE ARGUMENT.............................................19**

**ARGUMENT.................................................................... 23**

I. Standard of Review................................................................ 23

II. The Mississippi Whistleblower Protection Act........................... 23

A. The facts show causation here.............................................24

i. Defendants lied about knowing Johnson went to the Auditor... 24

ii. Timing....................................................................... 26

iii. Direct evidence of unlawful animus........................................ 28

iv. Pretext...................................................................... 30

a. Each and every one of the "legitimate" reasons has been rebutted and shown pretextual.............................................30

b. Regardless, there is no requirement to "rebut" each and every point in order to show pretext................................................33

III. The First Amendment............................................................ 34

A. Causation............................................................................ 34

i. The three step Mount Healthy burden shifting for public employment cases is not altered by Nieves................................... 35

a. The speech was a motivating factor......................................37

b. CPUC does not prove the Mt. Healthy defense "beyond all peradventure."..................................................................38

c. Even assuming a Mt Healthy defense, there is pretext.......... 41

ii. The Griggs case does not excuse CPUC......................................41

a. There is evidence of the whole Board's animus, including Hicks..............................................................................42

b. Regardless, the animus of either Mitchell or Miller was also decisive in the result...........................................................43

iii. The Griggs case does not excuse the individuals.......................45

a. The district court's reading of Griggs repeats the error this Court rejected in Sims by importing Monell doctrine into individual liability analysis..................................................... 45

b. Griggs could not have "unsettled" the applicable law because

it comes after the termination..................................................47

c. The district court erred in supposing there was no "proof that [Defendants'] influence or vote was outcome-determinative." 48

B. The protected speech and Pickering balancing............................. 49

i. This was protected speech..........................................................51

a. Johnson was a private citizen with no role in reporting to the city, press or auditor...............................................................52

b. This "official misconduct" is of public concern......................54

ii. This was high-value speech........................................................56

iii. The "disruption"....................................................................57

a. Only real disruption counts..................................................57

b. Defendants' version of disputed facts is insufficient.............58

c. Neither Defendants' retaliation nor their misconduct are legitimate sources of "disruption" that they can use to immunize themselves from liability........................................................58

d. Regardless, Defendants have not proven that the "disruption" is so disproportional to the value of the speech that termination was "necessary"..................................................................61

IV. Plaintiff's Partial Summary Judgment Motion...................................61

**CERTIFICATE OF SERVICE.................................................... 65**

**CERTIFICATE OF COMPLIANCE............................................. 66**

## TABLE OF AUTHORITIES

**Cases**

*Bevill v. Fletcher*, 26 F. 4th 270 (5th Cir. 2022) .......... 57

*Brady v. Ft. Bend Cty.*, 145 F. 3d 691 (5th Cir. 1998) .......... 39

*Brady v. Houston ISD*, 113 F.3d 1419 (5th Cir. 1997) .......... 37

*Branton v. City of Dallas*, 272 F.3d 730 (5th Cir.2001) .......... 54, 57

*Campbell v. Rainbow City*, 434 F.3d 1306 (11th Cir. 2006) .......... 43

*Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008) .......... 54

*Clark v. City of Alexandria*, 116 F. 4th 472 (5th Cir. 2024) .......... 35-36

*Cox v. DeSoto Cty., Miss.*, 564 F.3d 745 (5th Cir. 2009) .......... 31

*Coughlin v. Lee*, 946 F.2d 1152 (5th Cir. 1991) .......... 35

*CPUC v. MDES*, 393 So. 3d 1048 (Miss. Ct. App. 2024) .......... *passim*

*Davis v. McKinney*, 518 F.3d 304 (5th Cir. 2008) .......... 52

*Degenhardt v. Bintliff*, 117 F.4th 747 (5th. Cir. 2024) .......... 26

*Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) .......... 37

*Fontenot v. Upjohn Co.*, 780 F.2d 1190 (5th Cir. 1986) .......... 38, 51

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .......... 49

*Garza v. Escobar*, 972 F. 3d 721 (5th Cir. 2020) .......... 51

*Guzman v. Allstate*, 13 F.4th 157 (5th Cir. 2021) .......... 38

*Graziosi v. City of Greenville*, 775 F.3d 731 (5th Cir. 2015) .......... 58

*Green v. Univ. of Miss.*, (No. 3:24-CV-233-SA-JMV) (December 10, 2025) .......... 62

*Griggs v. Chickasaw Cnty*, 930 F.3d 696 (5th Cir. 2019) .......... *passim*

*Goudeau v. Nat'l Oilwell*, 793 F.3d 470 (5th Cir. 2002) — 28

*Haverda v. Hays Cnty.*, 723 F. 3d 586 (5th Cir. 2013) — 34, 37

*Howell v. Town of Ball*, 827 F.3d 515 (5th Cir. 2016) — 52

*Jett v. Dallas ISD*, 798 F.2d 748 (5th Cir. 1986) — 46-49

*Kawaoka v. Arroyo Grande*, 17 F.3d 1227 (9th Cir. 1994) — 43

*Kinney v. Weaver*, 367 F.3d 337 (5th Cir.2004) — 54

*Lane v. Franks*, 134 S. Ct. 2369 (2014) — 52, 59

*LaVerdure v. Montgomery*, 324 F.3d 123 (3d Cir. 2003) — 43

*Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994) — 63

*Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274 (1977) — *passim*

*Modica v. Taylor*, 465 F.3d 174 (5th Cir.2006) — 54

*Monell v. New York*, 436 U.S. 658 (1978) — 46-47

*N. Miss. Comm., Inc. v. Jones*, 951 F.2d 652 (5th Cir. 1992) — 38

*Nieves v. Bartlett*, 587 U.S. 391 (2019) — 36

*Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 78 (1st Cir. 2000) — 40

*Pickering v. Bd. Dist. 205,* 391 U.S. 563 (1968) — *passim*

*Price v. Hinds Cnty School Dist.*, (No. 2024-CA-00841-COA) (Ct. App. Miss., January 27, 2026) — 44

*Reeves v. Sanderson Plumbing*, 530 U.S. 133 (2000) — 24

*Russell v. McKinney Hosp.*, 235 F.3d 219 (5th Cir. 2000) — 28

*Salge v. Edna ISD*, 411 F. 3d 178 (5th Cir. 2005) — 23, 54

*Sampson v. ASC Indus.*, 780 F. 3d 679 (5th Cir. 2015) — 18

*Sanchez-Lopez v. Fuentes-Pujols*, 375 F.3d 121 (1st Cir. 2004)   40

*Sims v. City of Madisonville*, 894 F.3d 632 (5th Cir. 2018)   *passim*

*Shams v. Delta State*, 681 F. Supp. 3d 614 (N.D. Miss. 2023)   62

*Squyres v. Heico Cos. LLC,* 782 F. 3d 224 (5th Cir. 2015)   29

*Univ. of Tennessee v. Elliott*, 478 U.S. 788 (1986)   31

*Victor v. McElveen*, 150 F.3d 451 (5th Cir.1998)   54

*Vojvodich v. Lopez*, 48 F. 3d 879 (5th Cir. 1995)   57, 61

*Wallace v. Cnty. Comal,* 400 F.3d 284 (5th Cir.2005)   54

## Statutes, Rules, and Constitutional Provisions, Other Sources

U.S. Const., First Am.   *passim*

28 U.S.C. § 1291.   1

Miss. Code § 21-27-11   4, 52-53

Miss. Code § 21-27-17   4

Miss. Code § 25-9-171   23, 25

Miss. Code § 25-9-173   23

Miss. Code § 25-9-175   23-24

## JURISDICTIONAL STATEMENT

Mark Johnson appeals from the October 20, 2025, opinion granting summary judgment, ROA.3357, and entering a final judgment, ROA.3382. This ruling was by the Honorable Judge Michael P. Mills of the United States District Court for the Northern District of Mississippi, which had both diversity and federal question jurisdiction of this lawsuit. ROA.292. Mr. Johnson is a citizen of Alabama, Defendants are all citizens of Mississippi, and the amount in controversy exceeds $75,000. ROA.292. The appellant timely filed a Notice of Appeal on October 21, 2025. ROA.3383. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

<u>Mississippi Whistleblower Protection Act</u>

1. Whether there is evidence from which a jury may find that Johnson was suspended and fired because of his reports to the State Auditor.

<u>First Amendment</u>

2. Whether there is evidence from which a jury may find that Johnson's protected free speech was a motivating factor in the actions against him.

3. Whether Defendants are entitled to summary judgment on their "*Mt. Healthy*" affirmative defense that they would have fired Johnson regardless.

4. Whether CPUC is liable where the evidence shows animus motivated all the CPUC voters that sought termination, including those that were outcome determinative.

5. Whether the district court erred in granting qualified immunity despite clear 2018 precedent setting the standard for individual causation.

6. Whether Defendants are entitled to summary judgment on their "*Pickering* balancing" affirmative defense.

**STATEMENT OF THE CASE**

### 1. CPUC considers Johnson "the best" and gives him a raise.

Mark Johnson is a licensed Professional Engineer with an MBA from the University of Southern Mississippi and thirty years of utility experience at the Southern Company (Mississippi Power Company and Alabama Power Company). Before working for Defendants, Johnson also served as CFO and then Interim General Manager at Canton Municipal Utilities. ROA.2142.

Johnson was hired as the General Manager of Clarksdale Public Utilities (CPU) on June 19, 2017. The vote to hire Johnson by the CPU Board of Commissioners (CPUC) was unanimous. His performance was highly successful. ROA.2142.

In January 2018, CPUC conducted a six-month review of Johnson's performance. The Commissioners (Freddie Davis, Jr , George Miller, James Hicks, Dr. James Humber and Donald Mitchell) awarded Johnson a 5% annual pay increase, which increased his pay from $150,000 to $154,500. At about that time, CPU Attorney David R. Hunt referred to Johnson as the best General Manager CPU had ever had and CPU Commissioner James Hicks referred to Johnson in a meeting of all CPU employees as the best

3

General Manager in the state. ROA.2143.

## 2. __Johnson's job is ministerial, and it is not his job to report matters to the City, law enforcement or the press.__

The statute which delineates the respective duties of the CPUC and the General Manager specifically gives CPUC broad, direct, and non-delegable statutory responsibility for (1) communicating with the City, (2) reporting matters to other investigatory agencies, and (3) directly supervising all CPU employees. Miss. Code § 21-27-17.

By contrast, the General Manager's duties under the statute are strictly ministerial, i.e., "the enforcement and execution of . . . decisions made and adopted by the commission." Miss. Code § 21-27-11; see ROA.2592 (Defendant's policy stating that the statute "grant[s] the manager only the power and authority to enforce and execute on a daily basis the . . . decisions made by the commission" and that Managers only "make recommendations" and must follow CPUC's direction in everything). The General Manager of CPU's job duties did not include interacting with the press. Press duties were assigned by CPUC to the Director of Communications and Public Relations, Chris Campos, who was solely responsible for interfacing with the press and media under the direct

supervision of the CPUC. Again, CPUC was Campos's direct supervisor, and thus Johnson did not even have indirect supervisory responsibility for press coverage. ROA.2143.

### 3. The Commission commits serious abuses

In 2018, Johnson began to have some serious concerns about CPUC. The five most significant of these early concerns are as follows:

a. City Commissioner Plunk uses his position for financial gain.

First, Johnson was concerned that City Commissioner Bo Plunk was continually asking for extensions on his personal utility account, as well as demanding that CPU send the City of Clarksdale money. Plunk stated that if Johnson did not make these things happen then Johnson would be fired. Plunk was essentially using his position to try to blackmail Johnson into granting both personal favors to himself and misallocating utility funds to the City. ROA.2143.

b. CPU Commissioner Mitchell engages in sexual harassment.

Second, CPU employee Shelia Profit told Johnson that CPU Commissioner (and thus one of her direct supervisors) Donald Mitchell had made an unwelcome request to have sex with her. ROA.2144.

c. CPU Commissioner Miller verbally abuses employees.

Third, Johnson was told that Commissioner George Miller had

referred to CPU CFO Steve Reed as a "fat son of a bitch" in front of several CPU employees, including Shelia Profit and Angela Furniss. Miller had told Johnson that Miller was planning to discipline Reed without following the law's requirements of process and good cause. ROA.2144

### d. Attorney Hunt bills improperly.

Fourth, Johnson was also concerned that CPUC's attorney bills were exceedingly vague and may not be accurate, and was particularly concerned that CPUC refused to ask for more details in its billing. ROA.2145

### e. The commissioners refuse to report issues to the State Auditor

Finally, Johnson was concerned that the CPUC refused to immediately report these and certain other issues with the phone recording system to the State Auditor. ROA.2145.

### 4.  **Johnson reports these concerns as a private citizen**

Johnson raised all the above issues in a series of emails to the CPUC. The Defendants knew that Johnson wanted to make reports to the State Auditor, and the Defendants did not authorize him to do it. ROA.2147 However, in his role as private citizen, Johnson was concerned about the utility's apparent desire to keep the matters quiet, and Johnson felt that he should report it to the State Auditor, the public, and other officials on his

own. ROA.2145 He specifically noted that he felt the sexual harassment allegations should be "included in the State Auditor's investigation into abuse of power by elected and appointed officials in Clarksdale." ROA.3268, ROA.721.

On July 24, 2018, at 3:29 PM, Johnson sent an email to the Commissioners with the subject line: "State Auditor." This email informed the Defendants that Johnson was himself going to "report matters pertaining to abuse of power by elected and appointed officials and other irregular matters to the State Auditor's Office." The email also notified the Commissioners that Johnson had directly involved the Mayor, the City Commissioners, City Attorney, and City Clerk, and would continue to speak to these officials to present his concerns. ROA.2149.

### 5. **Within a day, CPUC suspends Johnson explicitly for whistleblowing.**

Forty-five (45) minutes later the Defendants had a public meeting. At this meeting a City Commissioner and three (3) reporters for three different news organizations were present. ROA.2151.

In open session, Johnson reported again what he relayed in the email, that Johnson himself was reporting allegations of misconduct by the

Defendants and Plunk to the State Auditor and City. At this meeting, in executive session, the Defendants asked about "an alleged conversation between the employee and a Commissioner." ROA.2145

The meeting then adjourned until 2 pm the next day, to reconvene at an attorney's office for further discussion of "such matters and business as may properly come before the Commission." ROA.2157.

The next day, once again, press and the public were present, but the entire meeting was in executive session without Johnson present. The investigator Herring was also not present during the relevant parts of the meeting, and so these actions were taken by the Board on their own recognizance. The Board voted to suspend Johnson. ROA.2158.

Johnson was given a "Report of Preliminary Investigation" which explicitly listed Johnson's reports of Defendants' misconduct and Johnson's statements to the press as among the reasons for the suspension. It stated that "the General Manager has sent a series of e-mails to the Commission with copies to the attorney alleging all sorts of wrongdoing and misconduct on the part of Commissioners and others" and described Johnson's whistleblowing as an effort to "interfere" with CPUC by making "threats of disclosure of wrongdoing by some of the Commissioners." ROA.893. *See*

Motion to Supplement Record, Corrected Exhibit 6.[1] In fact, these were not threats, but reports about disclosures that were already happening. The suspension report also criticized Johnson's sharing information about misconduct with the Mayor and City Attorney "in an email," his interactions with the media, including information that Johnson had told the Delta Daily News, and suggestively implicated Johnson in a "'tip' to a local media representative of a 'whistleblower report' making general allegations (engaging in 'shenanigans')." ROA.893. *See* Motion to Supplement Record, Corrected Exhibit 6. The report also - for the first time - suggested that the Defendants thought that Johnson may be implicated in the recorded-phone-line issue. ROA.2145.

6. **The City investigates Johnson's allegations. CPUC files a First Amendment retaliation lawsuit against the City. The City drops the investigation to settle the suit.**

When Johnson reported CPUC's actions to City officials, they were not happy with CPUC. On July 30, 2018, the Mayor of Clarksdale, Chuck

---

[1] CPUC referred to this "Report of Preliminary Investigation" in the minutes, and it was quoted extensively in the memorandum opposing summary judgment. However, as an administrative oversight, it appears that the wrong report was attached as Exhibit 6 to the opposition to the motion for summary judgment. As stated in the accompanying motion to supplement the record on appeal, the quoted language in the memorandum brief is from the corrected exhibit.

Espy, sent a letter by hand delivery to Davis stating:

> This letter is to provide official notification to the
> Commissioners of the Clarksdale Public Utilities ("CPU") and
> its Board Attorney, David Hunt, to stay all meetings including
> but unlimited to a meeting scheduled for Tuesday July 31, 2018
> relating to matters involving Mark Johnson . . . . You are hereby
> directed to appear before the Board of Mayor and
> Commissioners ("Board") on Monday, August 6, 2018 at 12:00
> p.m. . . .

ROA.2193. The CPUC wrote back through its attorneys that it was

"declining" both requests. The City Attorney, Meeks, then responded,

restating the request to attend the August 6th meeting. In this letter, Meeks

clarified that the purpose of the meeting was to address concerns raised by

Johnson and others with "allegations of misconduct and violation of law

that have been reported to the Board, which the Board may consider as

grounds for removal of members of the Commission." ROA.2194.

To avoid being investigated and lawfully removed from their positions

for cause at the hearing, the Commission and each of the individual

Commissioners filed a lawsuit in this Court against the City, Mayor and

each of the members of the Board individually. They explicitly requested a

temporary restraining order and injunctive relief "prohibiting the Board of

Mayor and Commissioners of the City of Clarksdale from removing the

individual CPUC Commissioners," as well as money damages. The lawsuit alleged that the City was retaliating against them in violation of the First Amendment and the Mississippi Whistleblower Protection Act. Specifically, the CPUC lawsuit alleged that the Commissioners engaged in First-Amendment-protected free speech when they suffered Plunk's pressure on CPU to send money to the City and reported it to the attorney general - as well as other of the very same free speech issues Johnson has raised here. ROA.2196 et seq.

The City was evidently concerned by the expense of defending a potential lawsuit, and began recanting its support of Johnson. The City settled. One explicit requirement for settling the lawsuit was for the City to censor itself and Johnson: "It is further agreed that the City will not publically [sic] disclose any of the matters provided or addressed by Mark Johnson." The settlement also required the City to let CPUC proceed with firing Johnson. ROA.2209 et seq.

### 7.  <u>By a vote of 3 to 1, CPUC fires Johnson.</u>

With the City silenced, CPUC promptly terminated Johnson on September 25, 2018. The Commission first voted to adopt the report's findings. This vote was unanimous. ROA.778

But then Commissioner Miller made a motion to fire Johnson. Here the vote split. The vote was three "aye" to one "nay" with one abstention. ROA.778. Commissioner Humber voted "nay," apparently reflecting his view that the findings made in the investigator's report did not justify termination. Commissioner Davis abstained, apparently reflecting indecision on the question. Thus, if any of the three "aye" votes - Miller, Mitchell, or Hicks[2] - had joined Humber in voting "nay," then there would have been no majority for the motion and it would have failed.

The termination letter explicitly relied - as item #1 - on Johnson's whistleblowing activities as a private citizen, which it called "insubordination." ROA.794. It characterized the whistleblowing as follows: "You defied the legal authority of the commission . . . [and] engaged in efforts to control and then thwart the investigation of personnel performance issues, such conduct constituting insubordination." ROA.794 It cited the protected activity a second time when it discussed Johnson's "attempt to obtain from an employee a sworn statement containing allegations of sexual harassment of that employee by a Commissioner." ROA.794. By voting to terminate for these reasons, Hicks, Miller and

---

[2] Hicks died on March 9, 2021, before his deposition could be taken.

12

Mitchell all signed on to this explicit rationale.

The investigation report that CPUC read and relied on in making this decision to terminate explicitly notes that Johnson reported to the State Auditor, describing Johnson's email on July 11th asking to report these matters to the State Auditor, as well as the fact that the city authorities voted to ask Johnson make a report to the State Auditor. ROA.801, ROA.805. Significantly, the record of documents used to fire Johnson included at least four news articles that had come out about Johnson and the CPUC after his suspension, and which were used as evidence to fire Johnson. ROA.3220. Among these articles - which were explicitly relied on as part of the basis for terminating Johnson by the CPUC - were reports that Johnson had contacted the State Auditor. ROA.3228.

8. **MDES and the Mississippi courts conclude "the evidence does not establish that [Johnson] intentionally circumvented and/or violated policies and procedures."**

The issue of Johnson's termination and the reasons supporting it were fully litigated in a lengthy hearing before the Mississippi Department of Employment Security. ROA.2214 - ROA.2558. At this adversarial hearing, the evidence proved that Johnson did not engage in any deliberate misconduct concerning the recorded phone lines or any of the other

allegations against him. After hearing from all of the witnesses - including testimony from Commissioner Davis and others - and reviewing all the relevant documents presented by the parties, the ALJ weighed the credibility of all the witnesses and documents and made findings:

> The employer learned that all of its telephone lines were recorded following installation of a new telephone system. The employer informed the claimant that this was a potential criminal act and that it was notifying the FBI for further action. The claimant began investigation into the phone lines issue at the request of the employer. He expressed displeasure with employer's board of commissioners and the employer's attorney. The employer subsequently brought in its own investigator. The employer suspended the claimant with pay on July 25, 2018, along with two other employees.

> The employer's investigation expanded to include issues other than the recording of its phone lines. While suspended, the claimant cooperated with the mayor and city of Clarksdale in a dispute with the employer's board of commissioners. The employer believes this constituted insubordination. He had contact with members of the press. The employer claimed information that he released regarding a former employee was from personnel records. The claimant maintained that it was not. The employer questioned certain petty cash expenditures. The claimant believed the expenditures were not outside of normal practices and procedures. The employer believed that a single source purchase and a city utility pole attachment project were not handled properly. The claimant disputed those findings. The employer believed that an employee has a basis to file a grievance against the claimant in which she alleged pressure by the claimant to file a sexual harassment claim against a commissioner. The claimant acted on information that he deemed reliable. . . .

> [T]he evidence does not establish that the claimant

14

> <u>intentionally circumvented and/or violated policies and procedures.</u> The evidence does not show that the claimant directed that all telephone lines be recorded or that he intentionally withheld information regarding said recording from the employer. . . .

ROA.2536 - ROA.2537 (emphasis added). Defendant appealed this decision and lost at every level of the Mississippi courts. *CPUC v. MDES*, 393 So. 3d 1048 (Miss. Ct. App. 2024). The hearing record shows CPUC knew at the outset that the FBI had declined to investigate. ROA.2337 - ROA.2338. It shows CPUC knew that Johnson had asked the Board for more authority to continue investigating the phone line recordings, including by giving him more scope to investigate and by going to the State Auditor, and that the Board refused. ROA.2364 - ROA.2368.

The MDES credited Johnson's explanations for <u>all</u> the stated reasons for termination. ROA.2404 - ROA.2423. For example, MDES heard live testimony from both Profit and Johnson about the sexual harassment issue, weighed their credibility, and credited Johnson. ROA.2383 - ROA.2403.

### 9.  **The present lawsuit is filed, improperly dismissed by the district court, then reinstated on appeal.**

Meanwhile, on September 22, 2021, Mark Johnson had filed the present case in the U.S. District Court for the Northern District of

Mississippi. ROA.20 (original pleading); ROA.292 (operative amended pleading). The District Court dismissed the case on the pleadings based on a mistaken interpretation of the statutes of limitations. ROA.534. On appeal, this error was corrected and the case remanded. ROA.552.

### 10. <u>The district court enters summary judgment.</u>

On remand, on October 20, 2025, the district court granted summary judgment to all the Defendants. ROA.3357.

#### a. <u>Mississippi Whistleblower Protection Act: Causation</u>

Concerning the Mississippi Whistleblower Protection Act, the one and only basis for granting judgment was causation. Factually, "the Court acknowledges the sequence of events may create a factual dispute regarding Mr. Miller and Mr. Mitchell's knowledge or motive." ROA.3381 "Nevertheless," it granted summary judgment because it claimed "Mr. Johnson has not rebutted each of the legitimate, non-retaliatory grounds for termination," and that this was required to prevail. ROA.3381.

#### b. <u>First Amendment against all Defendants: Causation generally</u>

Concerning the First Amendment, the district court first correctly found that this was protected speech as a private citizen under *Garcetti* and its progeny. ROA.3361-68. However, it still ruled in favor of all defendants

16

for the same reason as under the MWPA, requiring more than a "fact issue" concerning animus, and instead requiring proof that each "legitimate" reason was false. ROA.3374-3375, 3378.

    c.  <u>First Amendment causation against CPUC: "majority" animus</u>

Concerning CPUC liability specifically, the Court also held that Mitchell's and Miller's animus is not "chargeable to" CPUC under *Griggs*, because it found that a majority of the entire Board (rather than the voting members, or the dispositive voting block) must have animus, and "even if a reasonable jury could find that one or both commissioners harbored retaliatory motive, such individual animus cannot be imputed to the Board as a whole . . . [because] the record contains no evidence regarding Commissioner Hicks." ROA.3375-3376.

    d.  <u>First Amendment causation against Mitchell & Miller: individual causation</u>

On qualified immunity, the Court held that this Court's 2019 *Griggs* decision unsettled the question of Mitchell's and Miller's liability for the termination in 2018, despite the fact that their votes were a "but for" cause of the termination, and the law of *Sims* in 2018 concerning but-for causation as the sole question for individual liability was well established at

17

the time of the termination. ROA.3379.[3]

    e.  First Amendment against all Defendants: *Pickering*

The district court also ruled that the protected interest in the speech was outweighed by its "disruptive" effect under *Pickering* as a separate basis for entering judgment under the First Amendment for all Defendants. ROA.3369-3373.

**11.    Johnson appeals**

The next day, Johnson timely filed this appeal. ROA.3383.

---

[3] The district court suggested - without addressing the issue - that Miller may also be subject to dismissal because ninety days had passed since a suggestion of death had been filed. However, the certificate of service of the suggestion of death did not state that it was properly and personally served on the duly appointed administrator of Miller's estate, as required by law to start the 90 day clock. *Sampson v. ASC Indus.*, 780 F. 3d 679 (5th Cir. 2015) (holding that the 90 day clock does not begin to run until there has been personal service on the estate, even if the attorney for the decedent was notified of the suggestion of death). Thus, any such issue is not yet ripe, since no notice has been given that a procedurally valid suggestion of death has been served on the estate. ROA.581-582.

## SUMMARY OF THE ARGUMENT

The district court erroneously awarded summary judgment concerning two employment retaliation claims regarding Mark Johnson's termination by the Clarksdale Public Utility Commission.

### Mississippi Whistleblower Protection Act

The first claim is under the MWPA. The only issue is causation: whether there is evidence from which a jury could conclude that Johnson was suspended and fired because he contacted the State Auditor. The traditional cirumstantial halmarks of retaliatory animus are all present.

Timing: Johnson had good performance reviews and relationships until July 24, 2018, when he emailed Defendants that he was reporting misconduct to the State Auditor. At their meeting the next day, Defendants suspended Johnson and instructed their investigator find any wrongdoing he could. As soon as the report came back, they fired Johnson.

Direct evidence: The suspension letter, termination letter and report referred to the whistleblowing as a form of "insubordination" and "interference" and listed it as a reason for termination. This is direct evidence of causation - or at least strong circumstantial evidence in the "overall evidentiary mix."

19

Dishonesty: Defendants claimed under oath they were unaware Johnson reported to the State Auditor, a lie contradicted by Johnson's email and Defendants' own documents. Such lies indicate a desire to cover up retaliatory animus.

Pretext: Each of the grounds for termination cited by the CPUC were systematically refuted through evidence at the MDES hearing. The ALJ heard it and found none of them had merit. The jury is likely to do the same. Such pretext is a classic indicator of causation.

Disproportionate discipline: Even assuming any misconduct were credited by the jury, termination was disproportionate.

## First Amendment

The district court correctly identified Johnson's reports of official misconduct, sexual harassment, and financial abuses as protected speech made as a private citizen on matters of public concern. However, it erred in its subsequent causation and "*Pickering* balancing" analysis.

*Mt. Healthy* Causation: The court failed to apply the correct legal analysis to causation, relying on wrongful arrest cases that have no application to the burden shifting analysis for public employment cases. As just discussed, the speech was a motivating factor, and Defendants cannot

meet the standard for summary judgment on their affirmative defense under *Mt. Healthy*.

Municipal Liability: The court incorrectly held that the CPUC could not be liable because Johnson failed to show a "majority" of the five-member Commission harbored animus. But the circumstantial evidence of causation applies to the entire Commission. Regardless, the caselaw does not require proof of three members with animus, only that a decisive margin - here, a single voter - harbored animus.

Individual Liability: The court erroneously granted Commissioners Mitchell and Miller qualified immunity, claiming the 2019 *Griggs* decision "unsettled" the law established in 2018 in *Sims*. But *Griggs* addressed *Monell* municipal liability, not individual liability. And *Sims* itself is clear that cases like *Griggs* have no application to individual liability. Regardless, *Griggs* can have no impact on qualified immunity since it post-dates the termination. Both Mitchell and Miller caused the termination by their outcome-determinative votes; Miller caused the termination by making the motion to terminate; and both of them exercised "influence" on the outcome that the jury may consider sufficient proof of causation.

21

*Pickering* <u>Balancing</u>: The court misweighed the *Pickering* factors. Johnson's reports of extortion, sexual harassment, and financial abuses are of the highest public value. The court improperly minimized this value and inflated the "disruption" factor by including disruption that was proximately caused by the Defendants' own illegal retaliation (the suspension) and their underlying misconduct (the City investigation). Defendants did not meet their burden to prove "beyond all peradventure" that the termination was "necessary" to avoid disruption proximately caused by the speech itself, and outweighing the high public interest.

The judgment should be vacated and remanded with costs, and with instructions to decide plaintiff's partial summary judgment motion set the case for a jury trial.

## ARGUMENT

### I.   <u>Standard of Review</u>

Summary judgment is reviewed *de novo* under the familiar standards, drawing all reasonable inferences in favor of the non-movant and granting judgment only if there is no genuine dispute of material fact. *Salge v. Edna Independent School Dist.*, 411 F. 3d 178, 184, n.3 - n.9 (5th Cir. 2005). Two claims are at issue: a Mississippi Whistleblower Protection Act claim, and a constitutional free speech retaliation claim.

### II.   <u>The Mississippi Whistleblower Protection Act</u>

It is undisputed that Johnson made "good faith reports [of] an alleged improper governmental action to a state investigative body" under the Mississippi Whistleblower Protection Act. Miss. Code Ann. § 25-9-171(j).

If "as a result of being a whistleblower," Johnson "has been subjected to workplace reprisal or retaliatory action" - including "suspension" and "dismissal" - then he "is entitled to the remedies" of the Act. Miss. Code Ann. § 25-9-173(2).

The "agency which violates" this provision "shall be liable." Miss. Code Ann. § 25-9-175. *Respondeat superior* liability is therefore automatic.

"Additionally, <u>each member</u> of <u>any agency's governing board</u> or

23

authority may be found individually liable for a civil fine . . . ." Miss. Code Ann. § 25-9-175. Board member liability is therefore also automatic simply by virtue of being on the board of the agency that commits the violation.

This state statute includes no *Garcetti* exception, *Pickering* balancing, qualified immunity, or other potential defenses. Thus, the only question to address is the fact question of causation: whether the suspension and termination were "as a result of being a whistleblower."

A.  <u>The facts show causation here.</u>

        i.  *Defendants lied about knowing Johnson went to the Auditor*

It is a "general principle of evidence law that the factfinder is entitled to consider a party's dishonesty about a material fact as 'affirmative evidence of guilt.'" *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 148 (2000)(citations and quotations omitted). In their depositions, Defendants claimed that they had no idea Johnson reported to the State Auditor.

This is a transparent lie as proven by the documents. Johnson emailed the CPU Commissioners - all of them, including Hicks, Miller, and Mitchell - stating that he was going to "report matters pertaining to abuse of power by elected and appointed officials and other irregular matters to the State Auditor's Office." He sent this in an email with the subject line

24

"State Auditor" on July 24, 2018, at 3:29 p.m. He did this after Defendants told him not to contact the State Auditor, but before he was suspended for so-called "insubordination" and "interfering" with CPUC.

The email leaves no room for doubt that Johnson is reporting matters to the State Auditor. It is explicit. No reasonable reader could interpret it as anything but an announcement that Johnson is reporting to the State Auditor's Office.

Beyond that, at the meeting occurring at 4:15 p.m. that same day, Johnson told CPUC out loud that Johnson was reporting to the State Auditor's Office. This too is enough for the jury to conclude that the Defendants lied in claiming they did not know about the report.[4] Herring's attachments to his report - which the Defendants testified (and the minutes report) they read before deciding to fire Johnson - explicitly state that Johnson went to the State Auditor.

In short, the jury could conclude - as part of the overall "evidentiary mix" showing causation - that Defendants lied about the fact that they knew

---

[4] It is important to note that the statute protects not only an employee who makes a report, but also "an employee who is believed to have reported alleged improper governmental action to a state investigative body." Miss. Code Ann. § 25-9-171(j).

Johnson reported to the State Auditor in order to cover up their retaliation.

### ii.    Timing

Then there is the timing. This Court reviews the entire "sequence of events" to determine whether a jury could infer causation from timing. *Mooney v. Lafayette County Sch. Dist.*, (No 12-60753) (5th Cir. August 8, 2013) (unpublished). Similarly, "a time lapse of up to four months may be sufficiently close" to support an inference of causation. *Feist v. La., Dep't of Just., Office of the Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). And the closer the timing, the stronger the support. *E.g. Melvin v. Barr Roofing Co.*, No. 19-10214 (5th Cir. Apr. 7, 2020) (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001))*; LeMaire v. Louisiana Dep't of Transp. and Dev.*, 480 F.3d 383, 390 (5th Cir. 2007).

Applying the analysis here, the timing is extremely close. Before the protected activity on July 24, 2018 at 3:29 p.m., CPUC thought Johnson was "the best" ever in the state. Up to this point, Johnson was consistently on the investig<u>or</u> side of the equation, pushing for more and better investigations by CPUC. The record is devoid of any evidence that anyone considered suspending him or including him as a subject of the investigation before that date and time.  The investigation was focused on

26

the actions of others, such as former manager Hemphill and Steve Reed.

The about-face occurs dramatically and suddenly after this email at 3:29 p.m., and immediately Johnson becomes the *subject* of the investigations. It begins at 4:15 p.m., when the CPUC begins applying pressure to discredit and implicate Johnson at the meeting. It continues the next day with the suspension and "Preliminary Investigation Report" which calls on Herring to probe into a variety of claims against Johnson that had not been raised before that 3:29 p.m. email.

Defendant may claim that the termination taking place two months later militates against causation, but this is incorrect. Two months is short enough to infer causation, particularly where, as here, the Defendant needed to give Johnson due process and articulate alleged "good cause" to end his contract. The jury would be within its rights to conclude that once that "Preliminary Investigation Report" concerning the suspension comes out, the CPUC is not likely to change its mind.

Even more important, the Defendants were prevented from firing Johnson for some time by the fear of losing their own jobs due to the City's investigation of Defendants, and it was only on September 10, 2018 - shortly before Johnson was fired - that the Defendants were able to use

27

meritless legal threats to browbeat the City into silence, thus leaving Defendants free to retaliate against Johnson.

In short, the chain of events here is extremely strong evidence of causation.

### iii.    *Direct evidence of unlawful animus*

Next there is the evidence from what Defendants themselves have said about their reasons for suspending and firing Johnson. Such "direct evidence" is among the strongest forms of proof of causation, and can be enough - all by itself - to prove causation where the statements are 1) related to the protected activity, 2) proximate in time to the termination, 3) made by an individual with authority over the employment decision at issue, and 4) related to the employment decision at issue. *Russell v. McKinney Hosp. Venture*, 235 F. 3d 219, 225 and 225 n.10 (5th Cir. 2000).

Regardless, even if not "direct," problematic comments reflecting animus can be highly relevant "in the overall evidentiary mix." *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F. 3d 470, 475 (5th Cir. 2015). Under this less demanding standard, the plaintiff must show that the comments involve "(1) discriminatory animus (2) on the part of a person that is either primarily responsible for the challenged employment action or by a person

with influence or leverage over the relevant decisionmaker." *Squyres v. Heico Cos. L.L.C.*, 782 F. 3d 224, 236 (5th Cir. 2015).

Item one in the termination letter is a claim that Johnson was "insubordinate" and tried to "interfere." This is a reference to, among other things, his stating "that the activities of the Commission be reported to the State Auditor." In concluding that Johnson was "insubordinate," Herring's report relies explicitly on Johnson's claim "that he has a right to 'go around' the Commission [and report wrongdoing] if he believes in his own judgment based upon his experience it would be best for the citizens of Clarksdale." Johnson was absolutely correct as to his rights, and the expressed desire of the CPUC to punish him for it is unlawful.

The same intent was manifested at the time of the initial suspension as well, where the "preliminary" report is quite clear that Johnson is being suspended in part because of the very email where he notified them he was reporting to the State Auditor, stating "the General Manager has sent a series of e-mails to the Commission with copies to the attorney alleging all sorts of wrongdoing and misconduct on the part of Commissioners and others" and describing Johnson's whistleblowing as an effort to "interfere" with CPUC by making "threats of disclosure of wrongdoing by some of the

29

Commissioners."

### iv.  Pretext

a. Each and every one of the "legitimate" reasons has been rebutted and shown pretextual

Defendant argues that its stated reasons for termination are bulletproof, and leave no room for doubt that the State Auditor report had nothing to do with the termination. Five (5) other adjudicators have disagreed with this interpretation of the evidence: the MDES investigator, the MDES Administrative Law Judge, the MDES Board of Review, the Circuit Court, and the Mississippi Court of Appeal. *CPUC v. MDES*, 393 So. 3d 1048 (Miss. Ct. App. 2024). And the ALJ did so after hearing live testimony from the witnesses and reviewing the same documents Defendants introduce here to support their claim.

The same question presented in this case was presented in that one: whether "the employer discharged the claimant for allegedly violating policies and procedures." In that case the Defendants introduced evidence and testimony of "what the board deemed to be violations of policy and procedures." The MDES held - as a specific finding of fact and conclusion necessary to support the outcome of the decision - that the same evidence submitted to this Court "does not establish that [Johnson] intentionally

circumvented and/or violated policies and procedures. The evidence does not show that the claimant directed that all telephone lines be recorded or that he intentionally withheld information regarding said recording from the employer."[5]

It bears noting that "[T]he decisions of [MDES] are given preclusive weight in Mississippi courts, if supported by the evidence and in the absence of fraud." *Cox v. DeSoto Cty., Miss.*, 564 F.3d 745, 748 (5th Cir. 2009); *see generally Univ. of Tennessee v. Elliott*, 478 U.S. 788, 794 (1986). The interests of comity and judicial efficiency require as much here. *Id.* Thus, the Defendants are specifically precluded from relitigating or arguing in this case that Defendants lacked evidence that Johnson "intentionally circumvented and/or violated policies and procedures" in firing him.

Regardless, even if not preclusive, at the very least a strong indicator that there is a genuine dispute as to the strength of Defendants' reasons for termination which the jury may resolve against the Defendants. The jury

---

[5] Other conclusions that the ALJ reached in *dicta*, such as that Johnson exercised "poor judgment," were not necessary to finding that Johnson was entitled to unemployment benefits, and thus have no preclusive effect.

will hear the same testimony from Johnson that the ALJ heard, testimony

which systematically refuted each of the claims of misconduct and

persuaded the Judge to rule in his favor, and therefore is likely to produce

the same result with the jury here.

As the ALJ found - and the jury here likely will as well - for example:

1) Johnson did not direct the phone lines to be recorded;[6] 2) Johnson did

not hide information from CPUC or the investigators; 3) Johnson's contact

with the Mayor, State Auditor, and press were not "insubordination," 4) the

petty cash expenditures were in accordance with normal practices and

procedures; 5) the single source purchase and utility pole attachment

project were properly handled; and 6) Johnson acted reasonably where he

had good cause to think sexual harassment was occurring and witnesses

were being pressured into silence. All this is supported by Johnson's

---

[6]    Liz Haynes' affidavit states former manager Hemphill ordered the recording of all CPU telephone lines. ROA.3218 CFO Steve Reed said the same in a signed statement. ROA.2621 In James Hemphill's interview with Herring, Herring never bothered to ask Hemphill if he (Hemphill) ordered the recording of all CPU telephone lines. ROA.2726 et seq. Brandon Soldevila's statement claims Steve Reed ordered the recording of all CPUC telephone lines and was the only one who knew about it. ROA.2795. At the MDES hearing, as the Circuit Court noted, "There was at least some concession by Commissioner Davis that Johnson did not order the recordings."

testimony and the evidence at the MDES hearing. *CPUC v. MDES*, 393 So. 3d 1048 (Miss. Ct. App. 2024)

Thus, every one of the alleged reasons for termination was the subject of extensive contrary testimony and evidence. There is an ample basis to reject each of those stated reasons as pretextual. The ALJ did. The MDES did. The Circuit Court did. The Mississippi Court of Appeals did. *CPUC v. MDES*, 393 So. 3d 1048 (Miss. Ct. App. 2024). The district court erred in holding that there was not enough evidence for the jury to reach the same conclusion as all these other adjudicators to consider the evidence.

> b. Regardless, there is no requirement to "rebut" each and every point in order to show pretext.

Neither CPUC nor the district court cited any authority holding that a whistleblower is required to have "rebut" every single allegation of misconduct in order to present a jury question about whether his termination was "as a result of being a whistleblower" under Mississippi law. And under traditional tort and evidentiary principles, the question is whether the circumstances permit an inference of retaliatory causation.

The facts here show that Commissioners Dr. James Humber and Freddie Davis, Jr., reviewed the independent report and its findings of

33

alleged misconduct by Johnson, and although they both agreed with the findings, ROI.778, neither of them felt that this was sufficient to justify an affirmative vote to fire Johnson. Humber voted against termination, and Davis remained undecided and abstained. ROI.778

Like Humber, the jury may look at the report and conclude that, even if the reported misconduct is true, it is not a strong enough basis to justify Johnson's termination. And if so, the "Aye" vote by Miller, Hicks and Mitchell must have some other cause - retaliation.

In sum, there is a jury question as to whether Defendants were unlawfully motivated in suspending and firing Johnson under the MWPA.

## III.   **The First Amendment**

As this Court has observed, "[s]ummary judgment should be used most sparingly in First Amendment cases involving delicate constitutional rights, complex fact situations, disputed testimony, and questionable credibilities." *Haverda v. Hays County*, 723 F. 3d 586, 591 (5th Cir. 2013) (quotations, emendations and citations omitted). Since causation was just discussed concerning MWPA, it makes sense to begin there. The analysis will then continue with a discussion of *Pickering* balancing.

A. Causation

The district court's decision states the wrong legal framework, and then misapplies it to the facts of this case.

> ### i. The three step Mount Healthy *burden shifting for public employment cases is not altered by* Nieves.

"To succeed on a First Amendment retaliation claim, the plaintiff must show that (1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in commenting on matters of public concern outweighs the [d]efendant's interest in promoting efficiency; and (4) his speech <u>motivated</u> the adverse employment decision." *Clark v. City of Alexandria*, 116 F. 4th 472, 482 (5th Cir. 2024) (quotations omitted). At step one, this initial "motivating factor" standard is relatively low under *Mt. Healthy*.

The burden then shifts (at step two) to the employer to prove by preponderance of the evidence that it would have taken the same action regardless of the protected activity. *Id.* (discussing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977))

Finally, if and only if the employer has proven its affirmative defense, the burden shifts back to the plaintiff, who "may then 'refute that showing by evidence that his employer's ostensible explanation for the discharge is

merely pretextual.'" *Id.* (quoting *Coughlin v. Lee*, 946 F.2d 1152, 1157 (5th Cir. 1991)).

The district court, however, ignored *Mt. Healthy* burden shifting, and instead ruled "a plaintiff is required to show the motive was the but-for cause," citing *Degenhardt v. Bintliff*, 117 F.4th 747, 758 (5th. Cir. 2024) and *Nieves v. Bartlett*, 587 U.S. 391, 399 (2019). But *Degenhardt* was a wrongful arrest case - not a public employment case - and the district court erred by importing the standards applicable to the wrong "type" of case under the *Nieves* categorization of "types" of free speech retaliation.

As the Supreme Court explicitly states in *Nieves* itself, "in the public employment context [we] 'have simply taken the evidence of the motive and the discharge as sufficient for a circumstantial demonstration that the one caused the other,' shifting the burden to the defendant to show he would have taken the challenged action even without the impermissible motive." *Nieves,* 139 S. Ct. at 1722 (discussing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274 (1977)). The *Nieves* court was explicit that the causation analysis varies "in other types of retaliation cases." *Id.* Thus, as *Clark* recognizes, *Nieves* explicitly reaffirms, and does not abrogate, the burden shifting framework of *Mt. Healthy* for the public employment "type" of

36

retaliation case. *Clark*, 116 F. 4th at 482-83 (5th Cir. 2024) (quoting *Nieves*

for the general principle of retaliation, and applying *Mt. Healthy* (not

*Nieves*) to the causation burden shifting applicable to public employment

cases). And, applying *Mt. Healthy*, Johnson has a jury question here.

> a. The speech was a motivating factor.

Under step 1, the facts just discussed concerning the MWPA causation

analysis are sufficient to prove that the protected speech was a motivating

factor in the termination. *Haverda v. Hays Cnty.*, 723 F.3d 586, 589-94

(5th Cir. 2013) (concluding that circumstantial evidence was sufficient to

create a genuine issue of material fact on whether sheriff demoted

corrections officer because of a letter criticizing him, despite the sheriff

stating that he did not know who wrote it); *Brady v. Hous. Indep. Sch.*

*Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997) (noting that plaintiffs may rely on

"a chronology of events from which retaliation may plausibly be inferred");

*Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (concluding in

a Title VII case that a five-day gap between the protected activity and the

adverse employment action was close enough to infer a causal connection

between the two).

Again, there is the timing and chain of events, the direct evidence in

the official stated reasons for the suspension and termination, and the Commissioners' lying about knowing about the protected activity. All these facts - on top of the evidence of pretext - are sufficient to create a jury question on whether the speech was a motivating factor.

### b.  CPUC does not prove the *Mt. Healthy* defense "beyond all peradventure."

Proceeding to the second step, the summary judgment standard is heightened when the movant bears the burden of proof: "If the movant bears the burden of proof on an issue . . . he must establish [it] beyond all peradventure . . . to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986); *Guzman v. Allstate Assurance Co.*, 13 F.4th 157, 160 (5th Cir. 2021) (applying the same standard post-*Celotex*). Nothing whatsoever is required from the nonmovant if the movant fails to meet this very high burden in its motion. *Guzman*, 13 F.4th at 160 ("Only if the movant succeeds [in meeting this standard] must the nonmovant designate specific facts showing that there is a genuine issue for trial.")

It is a very rare case indeed in which this or any other court will grant summary judgment to defendants on their affirmative defense under *Mt. Healthy*, that Defendants "would have made the same decision even in the

absence of the protected conduct." *N. Miss. Comm., Inc. v. Jones*, 951 F.2d 652, 654 (5th Cir. 1992).

To be clear, the question is not whether Defendants <u>could have</u> issued the same discipline based on the alleged misconduct, nor is it whether a reasonable person would have issued the same discipline based on the alleged misconduct. The question here is whether, assuming the jury finds Defendants were retaliating, Defendants have nonetheless proven beyond any genuine dispute that they themselves <u>would have</u> done the same discipline regardless, such that no jury could find otherwise.

It does not appear that Defendants here have even offered testimony on this specific question. There is nothing in the record on it. But even if they had, the Defendants cannot rely solely on their own assertions as to what they would have done because the jury might not credit such self-interested testimony. *Brady v. Fort Bend Cty.*, 145 F.3d 691, 714 (5th Cir. 1998). Like Defendants here, the defendant in *Bryant* pointed to nothing—no comparators, no other facts—which would <u>require</u> it to take the action it did for the stated reasons. The Fifth Circuit explained that "the jury had the exclusive authority to assess the credibility of witnesses, including [the decision maker]. It was therefore free to discredit [his]

testimony regarding his motivation for failing to rehire the Plaintiffs." *Id.* That is the case here.

To obtain summary judgment at this stage, Defendants must offer clear, objective evidence (i.e. evidence that "others . . . were also terminated" for the same supposed reasons) of what would have happened if Plaintiff had not engaged in protected speech. *Padilla-Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 78 (1st Cir. 2000). For example, "[i]f defendants [could] demonstrate[] that they in fact have a practice of taking corrective action against all employees in such positions, or could otherwise show that they would have taken the corrective action anyway, then they [would be] entitled to prevail." *Sanchez-Lopez v. Fuentes-Pujols*, 375 F.3d 121, 131 (1st Cir. 2004).

Thus, the usual methods of proof of this defense would be to show, for example, that Defendants lacked discretion because policy explicitly spells out that termination is mandatory, or that comparators who did not engage in protected activity were uniformly disciplined in the same way for the same alleged misconduct. Defendants have none of that here.

In short, there is every reason for a jury to look at the testimony and find that Defendants simply have not met their burden of proof.

40

c. Even assuming a *Mt Healthy* defense, there is pretext.

Again, the district court erred in requiring Plaintiff to prove at step 1 that all the stated reasons for discipline are pretextual, and in ignoring the burdens under *Mt. Healthy*. But even assuming that a *Mt. Healthy* defense were proved, there is adequate evidence showing each of the stated reasons for termination is pretextual. As previously discussed concerning the MWPA, the jury will hear the same testimony and evidence that the ALJ heard, testimony which systematically refuted each of the claims of misconduct and persuaded the ALJ to rule in his favor, and therefore is likely to produce the same result with the jury here. As stated plainly above, all six of the stated reasons for termination are subject to contrary proof. *CPUC v. MDES*, 393 So. 3d 1048 (Miss. Ct. App. 2024).

ii. *The* Griggs *case does not excuse CPUC*

The district court erred in relying on *Griggs* to find CPUC not liable. *Griggs v. Chickasaw Cnty., Miss.*, 930 F.3d 696, 704 (5th Cir. 2019). In *Griggs*, the evidence of animus was based on various comments made by some of the individual supervisors. The vote was unanimous on the five-member board. The *Griggs* Court held that "where the evidence [of animus] relates to individual members of a board, . . . . a majority of the

41

multimember body [must] ha[ve] the requisite motive" in order for the government agency as a whole to be liable. And because the vote was unanimous, that means that in *Griggs* at least three of the five supervisors voting for the action must have had animus for the employee to prevail. The employee did prevail because "at least three of the five board members had retaliatory motive. This evidence is legally sufficient to support the jury's verdict." The *Griggs* analysis is inapplicable here for three reasons.

### a. There is evidence of the whole Board's animus, including Hicks.

First, this case is not built on evidence that "relates to individual members" like the isolated, individual comments in *Griggs*. It is based primarily on facts that are equally true for <u>all members</u> of the CPUC: the timing and chain of events, the direct evidence in the suspension and termination communications by the CPUC as a whole, and the pretext. These facts concern the motive of the entire CPUC. Although there are extra facts showing that Miller and Mitchell had added incentive to retaliate - such as the fact that they were the named subjects of the whistleblowing - that does not mean that there is "no evidence regarding Commissioner Hicks" as the district court claimed. In fact, almost all the evidence of

42

causation is equally applicable to the entire CPUC, including Hicks.

      b. Regardless, the animus of either Mitchell or Miller was also decisive in the result.

Second and alternatively, this case is different from *Griggs* in that, unlike in *Griggs*, in this case the vote was not unanimous. Indeed, since the termination vote had only the bare minimum majority to pass, each and every one of the three votes in favor was outcome determinative, and any switch would have made the termination vote fail, 2 - 2. If Mitchell had voted against termination, Johnson would not be terminated. If Miller had voted against termination, Johnson would not be terminated. Thus, each of their individual animus is a cause of the termination.

Neither the district court nor Defendants have pointed to any case in which an <u>outcome determinative proportion</u> of the voting body harbored animus, and yet the body was not liable under this kind of doctrine.

The point of *Griggs* - and all the cases it cites[7] - is that animus by one

---

[7] *Campbell v. Rainbow City, Ala.,* 434 F.3d 1306 (11th Cir. 2006)("An improper motive of one of the members of a nine-member Planning Commission is not imputed to the rest of the Commission"); *LaVerdure v. Cty. of Montgomery,* 324 F.3d 123, 125 (3d Cir. 2003)("because he was only one member of the Board, those comments do not constitute County policy"); *Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1239 (9th Cir. 1994)("In this case, the council adopted the plan unanimously and there is no evidence that any other council member acted with discriminatory

or a small group of people may not always be enough, where they lack the power to make the decisive result in the vote of a larger group. This is just another manifestation of basic causation principles: if animus caused the termination there is liability; if it did not, there is not. Thus, the reason that in *Griggs* evidence as to three of the five members was required was because the vote in *Griggs* was unanimous. Under these specific circumstances, only if at least three of the five votes were swayed by animus would there be any reason to think there was any influence on the outcome.

If *Griggs* were read to require animus by a majority of the full board regardless of the vote count, the results would be absurd. For example, suppose that, in this case, Hicks had abstained rather than voted.

In this scenario, the motion would have passed 2 - 1 with 2 abstentions.[8] And as the district court admitted, there is a "factual dispute regarding Mr. Miller and Mr. Mitchell's knowledge or motive" - i..e, there

---

intent or that the council as a whole took the action with discriminatory intent.").

[8] Whenever a quorum is present, a majority of votes cast decides the outcome, regardless of abstainers. *Cf. Price v. Hinds County School Dist.*, (No. 2024-CA-00841-COA) (Ct. App. Miss., January 27, 2026)("of the five voting School Board members, two voted in favor of termination and one voted against upholding the decision to fire Price. The remaining two board members '[a]bstained' from voting.")

would be tenable proof that *all* those who voted to terminate Johnson were illegally motivated. And yet, there would <u>still</u> not be proof that a "majority of the CPUC acted with retaliatory motive." If the district court's interpretation were accepted, "two is not enough to constitute a majority of a five-member board" - so despite the fact that two is enough to sway the outcome, or even to comprise the <u>entire body of support</u> for the measure to pass, there would still be no liability for CPUC under this interpretation.

Suffice to say, this is not what *Griggs* - or any of its supporting authority - was saying. By using the term "majority," the *Griggs* court meant a decisive margin, which in that case happened to be a majority. That is not required here.

        *iii.*    *The* Griggs *case does not excuse the individuals*

The district court also granted qualified immunity to the individuals based on *Griggs*.[9] This was also in error.

> a. The district court's reading of *Griggs* repeats the error this Court rejected in *Sims* by importing *Monell* doctrine into individual liability analysis.

---

[9] The Court first held that Miller and Mitchell were not motivated by retaliatory animus because there is no "evidence rebutting those grounds" stated in the termination letter. The "motivating factor" analysis that should have been applied here is addressed *supra*.

The law before *Sims* was unsettled, but after *Sims* it is not. This Court in *Sims* went out of its way to settle the issue once and for all: "individual liability is just a matter of causation." *Sims v. City of Madisonville*, 894 F.3d 632, 640 (5th Cir. 2018). "Today's decision clarifying that *Jett* controls means the law will no longer be 'unsettled' in this area." *Id.* at 641.

The Court in *Sims* was very clear that the confusion arose because some courts were mixing up "individual liability" with "employer liability" under *Monell*; this Court criticized the erroneous cases as "another example of <u>relying on the law of **employer** liability for a question of **employee** liability</u>." *Id.* at 640 (emphasis added). The Court was emphatic that this error must always be avoided. Individual liability is only a matter of individual causation, and no *Monell* or other employer-liability-related nuance on that question can apply post-*Sims*.

Despite the very clear caution from this Court, the district court in this case repeated <u>exactly the same error emphatically rejected in *Sims*</u>, seeking to use a *Monell* doctrine limiting the employer's liability in *Griggs* to try to excuse the individuals from illegally causing the termination.

This is plain from *Griggs* itself, which states repeatedly that it is analyzing the question of *Monell* "municipal liability" and that it is about

46

"whether [individual] retaliatory animus is <u>also chargeable to the Board itself</u>." *Griggs*, 930 F. 3d at 704 (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978) and following cases). The defendant in *Griggs* was Chickasaw County - not the individual supervisors. The *Griggs* doctrine is subset of *Monell* doctrine, and entirely about the unique problem of determining whether an individual's animus can be attributable to the employer as a whole - exactly the kind of doctrine that *Sims* was very explicit has no bearing on the individual's own liability.

> b. *Griggs* could not have "unsettled" the applicable law because it comes after the termination.

Regardless, even if *Griggs* had been an individual liability case that somehow re-un-settled *Jett* post-*Sims*, it would still be irrelevant to this case because *Griggs* was decided in 2019 - which is after Johnson was fired in 2018. As *Sims* itself states, the whole point of the qualified immunity analysis is to determine the state of the law at the time of the action in September 2018. The *Griggs* case can have no bearing on that since it comes after the actions in this case. And in September 2018, the causation standard articulated by this Court for individual liability of <u>anyone</u> who is not a final decisionmaker was that articulated in *Sims*.

c. The district court erred in supposing there was no "proof that [Defendants'] influence or vote was outcome-determinative."

Finally, the district court apparently misunderstood the facts of individual causation as well. The Court recognized that *Sims* "held that non-final decisionmakers may be liable as if their retaliatory animus was a causal link" but claimed that *Sims* did not "address whether a single member's alleged animus can establish personal liability <u>absent proof that his influence or vote was outcome-determinative</u>." The statement of law is almost true, so far as it goes, but completely inapplicable to this case. The undersigned is not aware of a case establishing that individual commissioners are liable where their "influence or vote" makes no difference in the outcome. But that is not this case for three reasons.

<u>First</u>, the votes of both Mitchell and Miller were individually but-for causes of the outcome. As discussed above, if either had voted against the termination there would have been no majority and Johnson would not have been fired. Each of their votes was, in fact, individually outcome determinative. The district court apparently miscounted the vote.

<u>Second</u>, Miller is also liable for a second reason, above and beyond his vote: Miller made the motion to terminate Johnson. This is, of course, a

48

requisite step in the termination process; "but for" the "motion" to terminate - and the "second" to the motion - Johnson is not terminated. Just like the recommendation in *Jett*, making the motion is a part of the causal link. Therefore, even putting aside Miller's determinative role in voting on the outcome, the fact that he performed the necessary causal step of bringing the motion makes him individually a cause of the termination under *Sims*.

Third, it is also worth observing that, as to both Miller and Mitchell there is also the question of "influence," as the district court put it. In a small deliberative body that discusses and debates motions before they are voted, one motivated member can easily sway others to "go along" with a decision that is important to that particular member - just as recommending officials can often influence outcomes in which they have no vote at all. *Cf. Jett v. Dallas Indep. Sch. Dist.*, 798 F.2d 748, 758 (5th Cir. 1986) (holding the recommending principal liable for a school board decision in which the principal had no vote). These causal influences of these subtle interpersonal politics are uniquely within the province of the jury to assess.

B. The protected speech and *Pickering* balancing

49

Finally, there is the issue of *Pickering* balancing. In conducting *Pickering* balancing, the Court must keep in mind its obligation to "promote the individual and societal interests that are served when employees speak as citizens on matters of public concern and to respect the needs of government employers attempting to perform their important public functions." *Garcetti v. Ceballos,* 547 U.S. 410, 420 (2006) (discussing *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205,* 391 U.S. 563, 568-69 (1968)). "So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are <u>necessary</u> for their employers to operate efficiently and effectively." *Id.* at 419 (emphasis added). When this stage of the analysis is reached, there is evidence that the speech is constitutionally protected and that the plaintiff was fired because of his constitutionally protected speech. Thus, the bar for the defendants here is high. They must show that the specific circumstances of this case are such that they should be legally entitled to retaliate against protected free speech.

And Defendants bear the burden of proof: they must "establish that the government's interest in promoting the efficiency of the services provided by the employees outweighs the employee's interest in engaging in

50

the protected activity." *Garza v. Escobar*, 972 F. 3d 721, 729 (5th Cir. 2020). Thus, as with the *Mt. Healthy* defense discussed above, the Defendants here must establish the *Pickering* defense "beyond all peradventure . . . to warrant judgment in his favor." *Fontenot*, 780 F.2d at 1194. To show "beyond all peradventure" that the termination was "necessary" such that constitutional animus can be excused, is indeed a very high bar.

Although the district court correctly found the speech protected, it misweighed both the positive and the negative sides of the *Pickering* balance, and therefore improperly ruled against Johnson on summary judgment. But first, a few words are in order clarifying the strength of the district court's finding that this was protected speech.

### i.    *This was protected speech*

At the outset, it is worth noting the one thing the district court got right in its analysis: Johnson engaged in speech as a private citizen on matters of public concern. Indeed, the case is even clearer than the district court's analysis suggests.

51

a. Johnson was a private citizen with no role in reporting to the city, press or auditor.

When "a public employee takes his job concerns to persons outside the work place in addition to raising them up the chain of command at his workplace, then those external communications are ordinarily not made as an employee, but as a citizen." *Davis v. McKinney*, 518 F.3d 304, 313 (5th Cir. 2008). "This remains true when speech concerns information related to or learned through public employment." *Lane v. Franks*, 134 S. Ct. 2369, 2377 (2014). "The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379. Communications "outside the normal chain of command" are rarely part of "the day-to-day duties of a public employee's job." *Howell v. Town of Ball*, 827 F.3d 515, 524 (5th Cir. 2016) (discussing *Lane, supra* and *Davis, supra*).

Johnson's job duties are strictly defined and limited by a statute which delineates what responsibilities the CPUC is and is not legally allowed to delegate to the General Manager. Under this statute, the General Manager's job is purely ministerial, and is strictly limited to "the enforcement and execution" of "decisions made and adopted by the

52

commission." Miss. Code § 21-27-11. It gives him no power to report problems to the City or outside law enforcement. The statute states the CPUC itself is the one responsible for communicating with the City: "**It** shall report quarterly to the governing authorities of the municipality of all its doings and transactions of every kind whatsoever . . . and shall annually make a detailed statement covering the entire management and operation of the systems." *Id.* Again, the statute specifically lists communication with the City as the Commission's job - and not the General Manager. The same is true for reporting to <u>outside</u> enforcement authorities. This is shown by the fact that it is the Commission which is responsible for reporting to "the Public Service Commission." Indeed, it is CPUC itself which is required by law to be <u>the direct supervisor</u> of all the employees, having the non-delegable duty "to direct them in the discharge of their duties." This is not the General Manager's job. Thus here, when CPUC hired a "public relations" employee (Campos) and assigned that person the job of interacting with the press, it was itself directly responsible as Campos's supervisor.

In the report on which Johnson's termination is based, he is expressly disciplined for stating "that he has a right to 'go around' the Commission

53

[and report wrongdoing] if he believes in his own judgment based upon his experience it would be best for the citizens of Clarksdale." If this were part of his job, it would not be called "insubordination" in the termination.

> b. This "official misconduct" is of public concern.

In determining whether speech is on a matter of public concern there are three factors: content, context and form. *Salge*, 411 F.3d at 186 (5th Cir. 2005). "It is well-established, though, that speech relating to official misconduct or racial discrimination almost always involves matters of public concern." *Charles v. Grief,* 522 F.3d 508, 514 (5th Cir. 2008).[10]

As to content, the district court erred in claiming that "the content of Mr. Johnson's statements included two central demands: reinstatement as General Manager and removal of all CPU commissioners." This is - of

---

[10] Citing *Modica v. Taylor,* 465 F.3d 174, 180-81 (5th Cir.2006) (misuse of public funds and official malfeasance held to be matters of public concern); *Wallace v. County of Comal,* 400 F.3d 284, 289-91 (5th Cir.2005) ("[T]here is perhaps no subset of matters of public concern more important than bringing official misconduct to light."); *Kinney v. Weaver,* 367 F.3d 337, 369 (5th Cir.2004) ("[I]t is well-established in the jurisprudence of both the Supreme Court and this court that official misconduct is of great First Amendment significance."); *Branton v. City of Dallas,* 272 F.3d 730, 745 (5th Cir.2001) ("We have held that public employees' speech reporting official misconduct, wrongdoing, or malfeasance on the part of public employees involves matters of public concern."); *Victor v. McElveen,* 150 F.3d 451, 456 (5th Cir.1998) (plaintiff's speech "was inherently of public concern because it was a protest against racial discrimination").

course - not true of his pre-suspension speech, in which he was speaking with the Mayor, City Commissioners, and State Auditor and merely asking for investigations to be done. Regardless, however, the district court did correctly recognize that his speech went far beyond his own personal employment objectives to include "fifteen allegations" of serious misconduct - all protected content.

Concerning context and form, the district court's failure to consider the pre-suspension speech in the analysis again clouds its judgment. While saying "the chronology is critical," the district court then elides this key distinction by ambiguously describing the protected speech as happening in "late July." Again, it was immediately *before* the suspension - before Johnson had any private employment motives for his speech - that Johnson first raised these issues with the City Attorney, Mayor, City Commissioners, and State Auditor. The district court therefore errs in assuming all the speech is post-suspension "mixed speech" fighting back against the suspension and also raising public issues.

Regardless, the post-suspension speech is also protected. As the press itself stated explicitly: "Mark Johnson . . . ha[s] been on paid suspension for eight weeks. There is great public interest in this story and we are working

on several news items that will air next week." The press was always at these meetings, reaching out to Johnson for comments and breathlessly reporting on everything that was happening. The fact that the Mayor and City Council did get very much involved, and that Defendants themselves in a filing in district court argued that these were issues of public concern when they spoke on them, is strong evidence to support free speech protection. This is a vigorous "backdrop of public debate."

With that, the discussion turns to *Pickering* balancing, and the value of Johnson's contributions to that "public debate."

### ii.   *This was high-value speech*

In *Pickering* balancing, first the Court must consider the value of the speech. In assessing the value of the speech, all reasonable inferences must be drawn in favor of Johnson at summary judgment. For example, we must infer that Johnson is telling the truth about the report of sexual harassment he received from Profit, and that Profit and Mitchell lied to cover it up. We must infer that City Commissioner Plunk was attempting to extort monetary relief, both for himself and the City, by threatening Johnson. We must infer that Miller was verbally abusing and conspiring to deprive employees of their constitutional rights. We must infer that CPUC was

spending taxpayer money on bills submitted by its attorney that were not properly specified or valid. We must infer that CPUC was trying to prevent any report from being made to the State Auditor concerning the phone recording and the issues discussed above.

As the caselaw just discussed shows, this is speech of the highest value to the public.

### iii.    The "disruption"

In this context, this Court has "repeatedly recognized that 'a stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern.'" *Vojvodich v. Lopez*, 48 F. 3d 879, 885 (5th Cir. 1995) (citations omitted). Thus, the bar is high indeed for any "disruption" in this case. But first, a few words are in order about three items that do not count as "disruption."

### a.  Only real disruption counts

"Hypothetical" or "predicted" disruption is not enough: "'[r]eal, not imagined, disruption is required.' *See Branton v. City of Dallas*, 272 F.3d 730, 741 (5th Cir. 2001)." *Bevill v. Fletcher*, 26 F.4th 270 (5th Cir. 2022). Although the Court has sometimes also accepted "<u>reasonable</u> predictions of future disruption" - particularly in the sensitive context of law enforcement

officer employment - this has always been based on evidence showing that the plaintiff was going to engage in additional speech beyond that which already occurred, and it has always required some real evidence to demonstrate that these "predictions" are "reasonable" to substantiate the basis for them. *Graziosi v. City of Greenville*, 775 F.3d 731, 741 (5th Cir. 2015). The district court therefore misapplied *Graziosi*.

> b. Defendants' version of disputed facts is insufficient.

The district court's inference of bad faith, its claim that Johnson only "lashed out" when discipline "loomed," and "solicited false allegations," all run afoul of the requirement to draw all reasonable inferences in favor of Johnson. After all, the record (as the ALJ found) amply supports a contrary narrative, in which Johnson was in good faith pushing for investigations, and then CPUC lashed out when its own reckoning loomed, and CPUC solicited false testimony from employees and commissioners.

> c. Neither Defendants' retaliation nor their misconduct are legitimate sources of "disruption" that they can use to immunize themselves from liability.

Finally, and perhaps most importantly, it should go without saying that the Defendants cannot make use of their own misconduct to their

benefit in arguing that there was a "disruption" in the workplace. The district court's view that it does not matter "which party is to blame" for the "disruption" is deeply troubling, and threatens to encourage the worst kind of unconstitutional actions.

For example, suppose an employee blows the whistle on something - even something relatively minor, but still protected - and as retaliation the defendant defunds or disbands the entire agency. *Cf. Lane v. Franks*, 573 U.S. 228 (2014) ("if Lane ever requested money from the state legislature for the program, she would tell him, "'[y]ou're fired.'''"). Obviously this is disruptive in the extreme, and the public value of the whistleblowing comparatively limited. But is this the kind of "disruption" that weighs in the *Pickering* balancing against finding the speech protected? No, it cannot be. This is because the "disruption" to the agency was actually caused <u>by the illegal retaliation itself</u> - and <u>not</u> by the speech. This "disruption" is not proximately caused by the speech because it was the result of the subsequent retaliation. If it were otherwise, then the very worst unconstitutional bad actors would create their own defense simply by the extremity to which they overreact and retaliate.

Consider another hypothetical, in which an agency head murders his

59

deputy at work, and fires his secretary when she informs against him. Her testimony puts him in jail, and his trial and jail time cause massive disruption of the agency's work. Again, is this the kind of "disruption" that weighs in the *Pickering* balancing against finding her speech protected? No, it cannot be. Again, the disruption is more fairly attributable to Defendants' own misconduct in murdering his deputy and covering it up by a pressure campaign against the secretary. That underlying misconduct is the real cause behind the disruption - not the speech about the misconduct per se.

In the present case likewise, "disruption" caused by illegally suspending Johnson in retaliation for his speech cannot be considered in the balance, since it is actually and proximately caused by the illegal retaliation, rather than the protected activity. So too, "disruption" caused by facing intrusive investigations from City officials is proximately caused by the Defendants own misconduct which was the subject of the investigation - and not by the speech which merely brought it to light.

With that in mind, there is little left for Defendants to hang their hats on as "disruption."

There is little to no evidence of any friction in Johnson's relationship with the CPUC commissioners prior to the date of his suspension. Thus, the

evidence shows the relationship with CPUC commissioners only deteriorated as a result of Defendants retaliation when they suspended him. Before that, his performance appraisals and relationships were very good. This "disruption" is proximately caused by the retaliation, not the speech.

Second, CPUC cannot legitimately blame Johnson's speech for the litigation CPUC itself filed against the City, since that too was Defendants' own choice. And the City's investigations were proximately caused by Defendants' misconduct, not Johnson's speech about that misconduct.

> d. Regardless, Defendants have not proven that the "disruption" is so disproportional to the value of the speech that termination was "necessary"

Regardless of the above, even assuming all the claimed "disruption" occurred and can be weighed in the balance, it is still insufficient particularly given the very high value of speech about City Commissioner extortion, CPUC Commissioner sexual harassment, and other issues itemized by Johnson. *Vojvodich, supra*. They have not shown proof "beyond all peradventure" that the termination was "necessary" such that constitutional animus can be excused.

## IV.  **Plaintiff's Partial Summary Judgment Motion**

Finally, the district court denied the Plaintiff's motion seeking "partial

summary judgment on all the affirmative defenses which were raised in the Answer - and all which could have been raised in the Answer and were not." The district court did not reach the merits, denying it as "moot" in light of its action on Defendants' motion for summary judgment. Without a district court decision to review, this Court's usual practice is to defer decision in the first instance to the district court. It should follow that practice here.

This Court's remand should make clear that the partial summary judgment motion should also be considered and decided on the merits by the district court in the first instance. This is particularly true in light of a disturbing trend in the Northern District of Mississippi in which that court has denied these kinds of motions without any substantive analysis whatsoever. *See Shams v. Delta State Univ.*, 681 F. Supp. 3d 614, 629 (N.D. Miss. 2023),[11] *accord Green v. Univ. of Miss.*, (Civil Action No.

---

[11] "This court notes that plaintiff has filed a rather unconventional motion for partial summary judgment, in which he takes issue with numerous affirmative defenses raised by defendant in its answer. This court has rarely seen plaintiffs file such motions, and it believes that they are generally unnecessary. In so stating, this court notes that, in its experience, many civil defendants routinely include a laundry list of affirmative defenses out of an abundance of caution, often copied and pasted from other cases. For this reason, this court generally does not pay a great deal of attention to affirmative defenses, unless and until it becomes clear that they will be an issue at trial."

3:24-CV-233-SA-JMV) (December 10, 2025). This practice is contrary to this Court's instructions: "A plaintiff should not be required to wait indefinitely for a trial when the defendant has a meritless defense that can be resolved on motion for summary judgment." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc). This Court should clarify the point on remand.

## CONCLUSION

Plaintiff-Appellant Johnson respectfully requests that this Court vacate the judgment of the District Court, award costs to Appellant, and remand this matter with instructions to decide the Plaintiff's Motion for Partial Summary Judgment, and then set the case for a jury trial.

Respectfully Submitted,

/s/ Joel F. Dillard
Joel F. Dillard
Joel F. Dillard, P.A.
775 N. Congress St.
Jackson MS 39202
(601) 509-1372, Ext. 2

*Counsel for Mark Johnson*

## CERTIFICATE OF SERVICE

I certify that, on February 3, 2026, I filed an electronic copy of this document with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit using the appellate CM/ECF system and that service will be accomplished by the appellate CM/ECF system on all counsel of record.

/s/Joel F. Dillard
Joel Dillard

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,915 words, as determined by the word-count functions of Google Docs, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f) and Fifth Circuit Rule 32.2.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally-spaced typeface using Google Docs in 14-point Georgia font.

/s/Joel F. Dillard
Joel Dillard